## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

FALINE ARNOLD,

        Plaintiff,

v.

                                  Action No. 2:22cv384

HUNTINGTON INGALLS INCORPORATED,

        Defendant.

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

*Pro se* plaintiff, Faline Arnold, sued her former employer, Huntington Ingalls Incorporated

("HII"), alleging sexual harassment hostile work environment, interference with Family and

Medical Leave Act ("FMLA") leave, retaliation, and constructive discharge. Third Am. Compl.

("Compl."), ECF No. 52. HII's motion for summary judgment has been referred to the

undersigned for a report and recommendation. ECF Nos. 299, 312. For the reasons discussed

below, the undersigned **RECOMMENDS** that HII's motion for summary judgment be

**GRANTED**.

### I.    UNDISPUTED FACTS[1]

Ms. Arnold worked as a deck electrician at Newport News Shipbuilding ("NNS"), a

division of HII, from November 2019 to September 2021. HII's Statement of Undisputed Material

Facts ("HII SOF") ¶¶ 1, 4, ECF No. 300, at 3–10; ECF No. 74, at 2.

---

[1] These facts are taken from HII's statement of undisputed material facts (ECF No. 300, at 3–10),
the admissible attachments to both parties' briefs (ECF No. 300-1–300-10, portions of ECF No.
310-1, ECF No. 311-2), and portions of Ms. Arnold's deposition testimony (ECF No. 300-3). The

## A.    Facts relevant to sexual harassment/hostile work environment claims.

Ms. Arnold alleges that, during her employment with HII in 2020 and 2021, two of her co-workers, Linwood Gatling and Kevin Cressman, sexually harassed her.  Compl. 5–14.[2]  Ms. Arnold also alleges that conduct by coworker Regina Arline constituted harassment, *id.* at 7, 14, but the Court previously dismissed the portion of Ms. Arnold's Title VII claim based on Regina Arline's conduct.  ECF No. 73, at 16.

In January 2020, HII assigned Ms. Arnold to work the third shift (10:00 p.m. to 6:00 a.m.) on foreman Wesley Harris' crew, one of several crews supervised by general foreman Adam Madison.  HII SOF ¶¶ 1–2.

Ms. Arnold and Cressman exchanged a series of messages over Facebook Messenger between June and September 2020.  *See* ECF No. 300-10.  Cressman was employed by a third-party and worked as a leased laborer at NNS.  HII SOF ¶ 6.  From 2020 to August 2021, Cressman worked the third shift on foreman Sidney Andrews' crew, which was also supervised by Madison.  *Id.* ¶ 6.

On March 16, 2021, foreman Harris emailed Elizabeth Bridges in HII's Labor Relations regarding a "verbal altercation" that occurred that day.  ECF No. 310-1, at 44.  Harris wrote that Ms. Arnold texted him that "Regina Arline [] had been bullying her for days [and] spreading rumors" and Ms. Arnold "wanted to address" the crew.  *Id.*; *see also id.* at 54 (Ms. Arnold's text message to Harris indicating she wants to "bring something up" during the Thursday meeting

---

facts, as well as all reasonable inferences to be drawn therefrom, are viewed in the light most favorable to Ms. Arnold, the nonmoving party.  *See Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013) (citing *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011)).

[2] Because the paragraph numbering in the third amended complaint is not sequential, the Court will cite to page numbers in the complaint.

regarding Arline gossiping and not working). Harris wrote that, after the "post-lunch shift check," Ms. Arnold spoke up, saying, "she didn't appreciate having her name thrown around in rumors, gossip . . . she started to make more pointed accusations directly towards Arline regarding her gossiping, spreading rumors, and before long they were screaming at each other." *Id.* at 44. After this meeting, Harris asked Ms. Arnold and Arline to write statements about the incident, and he forwarded them along with his report in the March 16 email to Bridges. *Id.*

On March 22, 2021, Ms. Arnold met with Harris and Bridges about the incident with Arline. HII SOF ¶ 9. Ms. Arnold mentioned coworker Linwood Gatling's name during this meeting but only "because Arline [wa]s friends" with Gatling. *Id.* ¶ 9 (citing Faline Arnold Dep. Mar. 25, 2025 ("Dep."), 207:14–15, ECF No. 300-3); *see also* Dep. 203:8–211:1 (testimony regarding meeting with Bridges). Gatling was a deck electrician employed by HII who was assigned to Harris' crew. HII SOF ¶ 7.

In February 2021, general foreman Madison began the process of reallocating third-shift personnel to ensure each crew had a mix of qualifications. *Id.* ¶ 3 (citing Madison Decl. ECF No. 300-2). As part of this reallocation, Madison transferred Ms. Arnold and at least 12 other employees to new crews in the same general work area. *Id.* ¶ 3. Madison moved Ms. Arnold to foreman Sidney Andrews' crew on third shift on April 12, 2021. *Id.* ¶ 3.

Following her move to Andrews' crew, Ms. Arnold met with Andrews and told him that she thought she was "being retaliated against for . . . mentioning . . . the harassing and bullying behavior from Regina Arline." *Id.* ¶ 10 (citing Dep. 229:18–23). Ms. Arnold said, "there was more information that was needed" and asked if she could "get like a union rep for that situation because [she] just felt like, you know, why was [she] being moved." *Id.* ¶ 10 (citing Dep. 229:23–

230:1). Ms. Arnold told Andrews she wanted to "explain what happened" and "there was more to the story." *Id.* ¶ 10 (citing Dep. 232:18–23).

After that meeting, Ms. Arnold met with Andrews and Alonzo Townes, her union representative. *Id.* ¶ 11 (citing Dep. 249:3–8). She "explained that from the situation with Regina Arline there was more in detail," and "we talked about that for a while, and then [she] moved into the other two people, which was Linwood Gatling and Kevin Cressman, mentioning the sexual harassment, mentioning the connection of it, and then [Townes] asked was [she] comfortable with showing [her] phone. [She] said absolutely. So [she] handed over [her] phone." *Id.* ¶ 11 (citing Dep. 249:6–24). Townes "looked through text messages" from Gatling and Cressman. *Id.* ¶ 11 (citing Dep. 250:9–12). Ms. Arnold asked if she could be moved back to Harris' crew and be "separate[d]" from Gatling. *Id.* ¶ 11 (citing Dep. 253:21–24).

On April 14, 2021, Andrews wrote an email to Bridges in labor relations with the subject line "employee issues." ECF No. 310-1, at 45. Andrews wrote that Ms. Arnold had been moved to his crew recently and "feels as if she has been targeted." *Id.* He reported on his meeting with Ms. Arnold and Townes on April 12, 2021, where she discussed issues with her co-workers on her previous crew. *Id.* Ms. Arnold explained that she felt "that she was moved after the incident took place where her previous foreman had to intervene because there were apparent threats and bullying towards her and also harassment towards her from others" and that she had "previously written a statement about the situations." *Id.* Lastly, Andrews wrote that he arranged for Ms. Arnold to meet with general foreman Madison about the situation. *Id.*

Ms. Arnold testified that she met with Madison because she "was upset with why [she] was moved." HII SOF ¶ 12 (citing Dep. 263:2–3). Ms. Arnold told Madison she was being "sexual[ly] harasse[ed]" and that she had "proof" on her phone. *Id.* ¶ 12 (citing Dep. 258:14, 259:8). When

Madison asked to see the proof, Ms. Arnold told him that her phone was "blacked out." *Id.* ¶ 12

(citing Dep. 259:20).

On April 14, 2021, Madison also wrote an email to Bridges in Labor Relations regarding

his meeting with Ms. Arnold, stating,

> [Ms. Arnold] was saying she has text messages showing issues with a member of
> the crew she is in now. I asked to see the messages and she said her phone battery
> is dying so no, I can see them tomorrow. I then asked her if she would write a
> statement, she said she has already started one, then the conversation went sideways
> . . . I am still not even sure who in the crew[ s]he is having an issue with. But here
> is what I do know. There are text messages I am not allowed to see and a partially
> written statement that when I asked for it I get a lecture on how horrible this
> company is for asking someone who has been harassed for a statement and to keep
> asking for it. . . . I think we need to schedule a meeting with at least another layer
> up as I believe she is mad at me for moving her and I cannot get information from
> her without that spilling into the conversation.

ECF No. 310-1, at 11.

In April 2021, Ms. Arnold called Bridges and told her there was "more to the story," and

that Ms. Arnold had "proof of sexual harassment." HII SOF ¶ 13. Ms. Arnold did not go "in-

depth" about her allegations in this call. *Id.* ¶ 13 (citing Dep. 290:20–24, 292:19).

On May 5, 2021, Ms. Arnold called NNS's OpenLine (run by a third party) to complain

anonymously about Madison. ECF No. 310-1, at 34–35. The "details" section of the OpenLine

report indicates Andrews asked Ms. Arnold to talk to Madison "about a harassment situation that

happened since the middle of 2020 with a female and a male employee (names and job[] title[s]

withheld)." *Id.* After Madison refused to talk in private, "the caller said that he/she had proof of

the sexual harassment situation and Madison said, 'well show me these pictures right now.' The

caller said that his/her phone was broken . . . . Madison started interrogating the caller with multiple

questions in front of other employees . . . The caller decided to leave out of frustration." *Id.* at 34.

HII terminated Linwood Gatling for poor attendance, and his last day worked was June 30, 2021. HII SOF ¶ 7. Kevin Cressman was transferred out of Andrews' crew on August 20, 2021, to work first shift at the opposite end of NNS. *Id.* ¶ 6.

Ms. Arnold submitted a letter of resignation on August 27, 2021, and she worked her last day with HII on September 8, 2021. *Id.* ¶ 4; ECF No. 310-1, at 67 (resignation letter).

On September 9, 2021, Ms. Arnold again called the OpenLine with a complaint against Bridges. ECF No. 300-6. The "details" section of the report states that Ms. Arnold made a report about Madison on May 5, 2021, and Bridges, "who is supposed to help make the work environment better for the employees, did nothing to make changes. [Ms. Arnold] felt she was being punished for standing up to the person bullying her. Madison was moved to a different department, but it was not because of the situation between [Ms. Arnold] and Madison. . . . she is still being harassed despite filing the previous report." ECF No. 300-6, at 2–3.

Sandy Veit, a NNS Ethics and Compliance representative, called Ms. Arnold after receiving the September 9 OpenLine complaint. HII SOF ¶ 16 (citing Dep. 280:1-3). Ms. Arnold told Veit "that [she] was being sexually harassed. They did not fix the situation. . . . [she] told [Veit] that [she] showed everybody proof but Madison." *Id.* ¶ 16 (citing Dep. 282:2–12). Veit's notes dated September 9, 2021, state

> [Ms.] Arnold stated that she had submitted her two weeks notice[] but wanted to let the company know that she was mistreated by Labor Relations Representative Elizabeth Bridges. When asked to provide examples[, Ms.] Arnold stated that she brought up some concerns of harassment by a female peer and nothing was done. She further stated that after reporting the harassment she was moved to another department. She doesn't feel[] Bridges took her concern seriously and mishandled the investigation. [Ms.] Arnold also stated that she had proof of being sexually harassed but Bridges refuse[d] to look at the evidence. Veit asked [Ms.] Arnold to provide the evidence either by email, fax or she could come to the Ethics Office

and show Veit said evidence.  [Ms.] Arnold stated that she did not want to do any of those things since she felt that no one would believe her.

ECF No. 300-6, at 4.

Ms. Arnold filed a charge of discrimination with the Equal Employment Opportunity Commission on December 12, 2021 ("EEOC charge").  ECF No. 54-1.  Ms. Arnold received a notice of right to sue from the EEOC on June 13, 2022.  ECF No. 6-2.

**B.    Facts relevant to FMLA claims.**

Ms. Arnold asserts that she requested FMLA leave in 2021 to care for her mother.  Compl. 16–17.  In April 2021, Ms. Arnold's mother, Rose Muniz, was 58 years old, was living in Virginia Beach and Philadelphia "back and forth," and had been wheelchair bound since 2019.  HII SOF ¶ 17 (citing Dep. 29:15–21, 41:5–13, 44:6–8, 56:13–14).  When she was living in Virginia Beach, Muniz stayed at hotels because Ms. Arnold's home was not wheelchair accessible.  *Id.* ¶ 17 (citing Dep. 43:25–44:7).

Foreman Harris and general foreman Madison printed FMLA forms for Ms. Arnold on or before April 1, 2021.  *Id.* ¶ 19 (citing Dep. 73:15–74:7, 82:6–12).  When Harris gave Ms. Arnold the forms, he told her that she needed to submit a certification form completed by a healthcare provider along with the request form.  *Id.* ¶ 20 (citing Dep. 75:24–76:8).  Harris also told Ms. Arnold that it did not "really matter" which healthcare provider filled it out, "as long as [she] can find someone and just get the information."  *Id.* ¶ 20 (citing Dep. 72:7–19).

HII's Labor Relations only approves FMLA leave requests for an employee to care for a family member with a serious health condition if the employee submits a WH-380 form signed by a healthcare provider.  Bridges Decl. ¶ 16, ECF No. 300-1.  "WH-380 forms" are the United States Department of Labor, Wage and Hour Division's certification forms provided for employer use ("certification form").  ECF No. 300-7, at 2–5.  Three pages of the four-page form are to be

7

completed and signed by a healthcare provider who provides medical information in support of the FMLA leave request, including information relating to the medical condition and the type and duration of treatment. *Id.* at 3–5.

Ms. Arnold put two forms on Harris' desk on April 1, 2021. HII SOF ¶ 20 (citing Dep. 81:15–18, 83:24–84:3, 86:21–87:6; ECF No. 300-7). The forms were the "Family and Medical Leave Request, Hourly Employees" ("request form")[3] and the certification form. *Id.* ¶ 20 (citing ECF No. 300-7; Dep. 73:15–74:7; 82:6–12). The certification form was not signed by a healthcare provider and did not have any information about Muniz's medical condition, the amount of leave needed, or the type and duration of treatment. *Id.* ¶ 21 (citing Dep. 86:16–87:20; ECF No. 300-7). Harris told Ms. Arnold that she needed a doctor's signature on the certification form for Labor Relations to approve the FMLA leave. *Id.* ¶ 21 (citing Dep. 91:14–17).

Ms. Arnold filled out a second FMLA request form dated April 18, 2021, but did not have a certification form signed by a healthcare provider. *Id.* ¶ 22 (citing Dep. 88:21–89:11, 93:2–9; ECF No. 300-8). Madison told Ms. Arnold, "if you don't have a signature" on the certification form, "you can't go." *Id.* ¶ 23 (citing Dep. 96:1–2). In response, Ms. Arnold told Madison she would "do another one." *Id.* ¶ 23 (citing Dep. 96:6). Yet Ms. Arnold ultimately decided to "t[ake] a pause" after this conversation with Madison because she "didn't even maybe need FMLA anymore" and she was "trying to find some type of solution alternatively" for her mother. *Id.* ¶ 23 (citing Dep. 97:6–21).

Ms. Arnold filled out a third request form dated July 1, 2021, which said that she needed to assist Muniz with "housing issues . . . due to her now being in a wheelchair. Needs wheelchair accessible housing." *Id.* ¶ 25 (citing Dep. 97; ECF No. 300-9). Ms. Arnold put the request form

---

[3] The form indicates that it "must be accompanied by" a certification form. ECF No. 300-7.

on Andrews' desk. *Id.* ¶ 26 (citing Dep. 98:7–17). The certification form was not signed by a healthcare provider. *Id.* ¶ 26 (citing Dep. 99:11–20); ECF No. 300-9. Madison told Ms. Arnold her July 1 request form was "going to get denied because you don't have the signature." HII SOF ¶ 26 (citing Dep. 100:13–14). Ms. Arnold told Madison she could not get a healthcare provider to complete and sign the certification form because Muniz "had several different primary doctors." *Id.* ¶ 26 (citing Dep. 100:15–16). At her deposition, Ms. Arnold was unable to identify any of her mother's primary care providers in Philadelphia or Virginia Beach and nor could she identify any healthcare providers who treated her mother between April and September 2021. *Id.* ¶ 26 (citing Dep. 36:5–11, 57:16–20)

## II.    PROCEDURAL HISTORY

Ms. Arnold sued HII in October 2022 and amended her complaint in November 2022, May 2023, and January 2024. ECF Nos. 3, 6, 9, 52.[4] The Court granted in part and denied in part HII's motion to dismiss Ms. Arnold's third amended complaint on September 24, 2024, allowing the case to proceed on Ms. Arnold's Title VII sexual harassment/hostile work environment claim (count one), Title VII retaliation claim (count three), FMLA interference claim (count six), FMLA retaliation claim (count seven), and constructive discharge claim (count eight). ECF No. 73, at 28–29.

On May 30, 2025, the Court sanctioned Ms. Arnold pursuant to Federal Rule of Civil Procedure 37(b)(2)(A)(ii), limiting her use of certain documentary evidence "in support of her claims going forward." ECF No. 296, at 9.

On June 4, 2025, HII moved for summary judgment on all remaining claims, ECF No. 299, with a memorandum in support, HII's Mem. In Supp. of its Mot. for Summ. J. ("HII Mem."),

---

[4] Ms. Arnold's complaints are not verified. ECF Nos. 3, 6, 9, 52.

ECF No. 300.  Ms. Arnold filed an opposition to the motion for summary judgment with attachments, and a "Statement of Genuine Disputes of Material Fact under Rule 56(c)(1)" on June 25, 2025.  ECF Nos. 308, 310.  HII replied on July 1, 2025.  Def's. Reply in Supp. of its Mot. for Summ. J. ("Reply"), ECF No. 311.   The Court granted Ms. Arnold's motion for leave to file a sur-reply, ECF No. 315, and she did so on July 10, 2025, Sur-Reply in Opp. to Def's. Mot. for Summ. J. 3 ("Sur-reply"), ECF No. 316.

### III.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that a district court shall grant summary judgment for a movant if such party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The existence of some alleged factual dispute "will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247–48 (1986).  A fact is material if "its existence or non-existence would affect disposition of the case under applicable law." *Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020) (citing *Anderson*, 477 U.S. at 248).  "A genuine question of material fact exists where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for the nonmoving party." *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012).

Although the initial burden on summary judgment falls on the moving party, once a movant properly files evidence supporting summary judgment, the nonmoving party may not rest on the mere allegations of the pleadings, but must set forth specific facts in the form of exhibits and sworn statements illustrating a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).  A court must determine whether sufficient evidence exists on a claimed factual dispute to

10

warrant submission of the matter to a jury for resolution at trial. *Anderson*, 477 U.S. at 249. Further, "[w]hen a party fails to establish the existence of an element essential to that party's case, there is no genuine issue of material fact and the movant is entitled to a judgment as a matter of law." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019) (citing *Celotex*, 477 U.S. at 322–23).

District courts have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)). In reaching its decision, a "court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted).

## IV.    ANALYSIS

### A.    *Pro se* litigants and Federal Rule of Civil Procedure 56(c)

Rule 56(c)(1) requires a party that asserts that a fact cannot be or is genuinely disputed to support that assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). A party may object that materials presented to support or dispute a fact "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

On June 5, 2025, the Court sent Ms. Arnold a notice outlining the consequences for failing to adequately respond to HII's motion for summary judgment and explaining how to appropriately respond.[5] ECF No. 301. The notice explained:

> If Plaintiff wishes to assert that a fact . . . is genuinely disputed, Plaintiff must (1) cite materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials; or (2) show that the materials cited by Defendant(s) do not entitle Defendant(s) to summary judgment. Plaintiff's failure to respond in the manner described above may result in the Court granting the motion. *See* Fed. R. Civ. P. 56; E.D. Va. Loc. Civ. R. 56.

*Id.* at 1–2. The notice clarified that "[a]ny affidavits (written statements signed under oath before a notary public) or declarations (unsworn statements declared to be true and correct under penalty of perjury) must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *Id.* at 1 n.1.

Along with her opposition to HII's motion for summary judgment, Ms. Arnold filed her statement of facts. ECF No. 308. In its reply, HII argues that Ms. Arnold's statement of facts failed to comply with Rule 56(c)(1) as Ms. Arnold "has not sworn to its contents under penalty of perjury and the Statement is not notarized nor is there any indication that a notary administered an oath to [Ms.] Arnold." Reply 3 (citing *Latney v. Parker*, No. 2:17cv24, 2017 WL 7794573, at *2 (E.D. Va. July 20, 2017), *aff'd*, 707 F. App'x 202 (4th Cir. 2017).

---

[5] On May 30, 2025, in an opinion and order addressing HII's motion for sanctions, the Court precluded Ms. Arnold's use of certain *documentary* evidence in support of her claims going forward and notified Ms. Arnold, "[i]n the event HII files a motion for summary judgment, the Court will issue a notice to Ms. Arnold, as a pro se litigant, addressing, among other things, Ms. Arnold's right to respond to such a filing and the timing, manner, and content of any such response. Subject to the limitations in this order, Ms. Arnold's ability to respond to any motion for summary judgment encompasses all the means described in any such later notice from the Court." ECF No. 296, at 9 n.4.

On July 10, 2025, Ms. Arnold requested leave of Court to file a sur-reply, and the Court granted her motion. ECF Nos. 314, 316. In the sur-reply, Ms. Arnold states that "courts must construe *pro se* filings liberally" and "any technical defect is outweighed by good-faith efforts, repeated attempts to comply, and [d]efendants' possession of the same documents." Sur-reply 3. Ms. Arnold did not, however, attempt to cure the deficiency identified by HII in her statement of facts by swearing to the facts under penalty of perjury or signing the statement under oath before a notary public, and the statement cannot be taken as true for purposes of summary judgment.[6] *See Latney*, 2017 WL 7794573, at *2; *Network Computing Svcs. Corp. v. Cisco Sys., Inc.*, 142 F. App'x 317, 321 (4th Cir. 2005).

While the Court has construed Ms. Arnold's filings liberally, "[t]he fact that plaintiff is proceeding pro se does not excuse her failure to follow the rules of court or the requirements governing competent summary judgment evidence." *Flint v. Action Pers., Inc.*, No. 7:13cv406, 2015 WL 631370, at *2 (W.D. Va. Feb. 13, 2015) (citing *McNeil v. United States,* 508 U.S. 106, 113 (1993) ("we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel")). "Thus, as courts have recognized repeatedly, even a pro se party may not avoid summary judgment by relying on bald assertions and speculative arguments." *Edmond v. Wells Fargo Clearing Servs., LLC*, No. 3:21cv139, 2022 WL 327757, at *2 (E.D. Va. Feb. 3, 2022), *aff'd*, 2022 WL 4463111 (4th Cir. Sept. 26, 2022).

Despite the Court notifying Ms. Arnold of her obligations, HII's reply identifying the deficient nature of her statement of facts, and the Court granting Ms. Arnold leave to file a sur-

---

[6] The Court notes that HII lists 26 undisputed material facts in support of summary judgment. HII SOF, ECF No. 300, at 3–10. In Ms. Arnold's statement of facts, she attempts to dispute only 4 of the 26 facts. ECF No. 308, at 1–4.

13

reply, Ms. Arnold has not submitted any factual assertions under oath or penalty of perjury. She did not submit an affidavit to oppose summary judgment, nor did she swear under penalty of perjury that the factual statements in her statement of facts, her opposition to summary judgment, or her sur-reply are true. "The oath, and the penalty of perjury which gives the oath its true power, gives the Court strong reason to believe that the materials supporting the motion or the opposition are authentic." *Vales v. Preciado*, No. 05-3110, 2012 WL 115425, at *2 (D. Md. Jan. 13, 2012). Consequently, with the limited exception below, the Court will not consider Ms. Arnold's factual assertions in her summary judgment filings, which are nevertheless scarce and inconsequential.

Ms. Arnold did not cite her 305-page deposition—which HII attached in full to its motion for summary judgment—(and with few exceptions, any other evidence in the record), to support her statement of facts, opposition to summary judgment, or sur-reply, but she did swear under oath to testify truthfully at her deposition. Therefore, to the extent that she has made discrete factual statements in those filings that are supported by her deposition, the Court will consider those facts in addressing the summary judgment motion. Dep. at 6:5–6, ECF No. 300-3; *see* Fed. R. Civ. P. 56(c)(3) (providing that the Court "need consider only the cited materials," but "*may* consider other materials in the record" when ruling on a motion for summary judgment (emphasis added)). Although "the [C]ourt may seek to reassure itself *by some examination of the record* before granting summary judgment against a pro se litigant[,]" *Sinclair v. Mobile 360, Inc.*, 417 F. App'x 235, 241 n.13 (4th Cir. 2011) (quoting Fed. R. Civ. P. 56 advisory committee note to 2010 amendment) (emphasis added), the Court need not "scour the record in search of evidence to defeat a motion[,]" *Hill v. Carvana, LLC*, No. 1:22cv37, 2022 WL 1625020, at *5 (M.D.N.C. May 23, 2022) (citing *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2011)). *See Harris Inv. Holdings, LLC v. BFJ of USA, LLC*, No. 1:23cv851, 2025 WL 1348500, at *6 n.9 (M.D.N.C. May 8, 2025)

14

(noting that the court "has no duty to scour the record for evidence"); *Shumate v. City of Lynchburg*, No. 6:23cv32, 2024 WL 2023121, at *5 (W.D.W. Va. May 7, 2024) ("[W]here—as here—a litigant has chosen not to cite any evidence in the record to show a dispute of material fact, the Court has no duty to scour the record to locate evidentiary support on their behalf."); *Jurgensen v. Albin Marine, Inc.*, 214 F. Supp. 2d 504, 510 (D. Md. 2002) (noting the court need not "scour the record looking for factual disputes" when a party raises factual assertions but "fail[s] to indicate where corresponding evidence in the record might be found" (citation omitted)).

Ms. Arnold also attached 114 pages of documents to her opposition.[7] ECF No. 310-1. The Court will address the relevant attachments in the discussion below.

## B.    Count I:  Title VII sexual harassment/hostile work environment

In count one, Ms. Arnold alleges she was subject to a hostile work environment at HII by way of Linwood Gatling and Kevin Cressman's sexual harassment.  HII is entitled to summary judgment on count one because Ms. Arnold has provided no evidence to establish Gatling's unwelcome conduct toward her and she did not file her charge with the EEOC timely, as she did so more than 300 days after the evidence shows Cressman's offensive conduct ceased.

### 1.    Legal standards

#### a.    *Title VII sexual harassment*

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against individuals "[w]ith respect to . . . terms, conditions, or privileges of employment, because of such

---

[7] The Court precluded Ms. Arnold from relying on many of the attached documents in the order entered May 30, 2025, which limited Ms. Arnold's use of certain documentary evidence in support of her claims going forward and outlined the documentary evidence on which Ms. Arnold could rely.  ECF No. 296, at 9–10.  As a result, Ms. Arnold may not rely upon, and the Court will not consider, these attachments to her opposition:  ECF No. 310-1, at 19–32, 48, 52, 61, 70, 85.  Ms. Arnold has included handwritten annotations on most documents attached to her opposition.  ECF No. 310-1.  The Court has ignored these annotations when considering the attachments.

individual's . . . sex [.]" 42 U.S.C. § 2000e–2.  "Since an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action." *EEOC v. R & R Ventures*, 244 F.3d 334, 338 (4th Cir. 2001).  An employee can maintain a cause of action under Title VII if sexual harassment creates a hostile work environment.  *Smith v. First Union Nat. Bank*, 202 F.3d 234, 241 (4th Cir. 2000).

To survive summary judgment on a hostile work environment claim, an employee must produce sufficient evidence for a reasonable juror to conclude that there was:  (1) unwelcome conduct, (2) based on her gender, (3) that was sufficiently severe or pervasive to alter the conditions of her employment and create an objectively and subjectively abusive work environment, and (4) was imputable to her employer.  *Okoli v. City of Baltimore*, 648 F.3d 216, 220–22 (4th Cir. 2011); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

### b.    Timeliness

"[A]n employee challenging an employment practice of an employer in Virginia has 300 days from the last date of alleged discrimination to file a charge with the EEOC."  *Edwards v. Murphy-Brown, L.L.C.*, 760 F. Supp. 2d 607, 619 (E.D. Va. 2011) (citing *Edelman v. Lynchburg Coll.*, 300 F.3d 400, 404 (4th Cir. 2002)).  Contrary to a discrete discriminatory action, an employee's sexual harassment claim that is grounded in a hostile work environment theory "is composed of a series of separate acts that collectively constitute one 'unlawful employment practice[,]'" and is thus subject to the "continuing violation theory." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 221 (4th Cir. 2016) (citation omitted).  Under the continuing violation theory, an employee can rely on harassing conduct that occurred outside the limitations period to establish a hostile work environment claim, and that claim will be timely so long as "at least one act continuing the violation occurred within the statutory period." *Id.* at 222.

16

### 2.    Linwood Gatling

Ms. Arnold alleges that Linwood Gatling sexually harassed her between February or March 2020 and May 2021.  Compl. 5–9.  HII argues there is no admissible evidence in the record that Gatling engaged in any inappropriate conduct, "let alone conduct that rises to the level of actionable harassment."  HII Mem. 21–22.

As the parties have completed discovery, HII is entitled to summary judgment on this issue if Ms. Arnold has "fail[ed] to make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  In addressing HII's motion to dismiss, the Court found the complaint, liberally construed, alleged facts sufficient to satisfy the requirements of a sexual harassment claim.  ECF No. 73, at 20.  Although Ms. Arnold made numerous allegations about Gatling's unwelcome conduct in her unverified complaint, she cannot "merely rely on matters pleaded in the complaint" to defeat summary judgment.[8] *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991).  Rather, Ms. Arnold must "go beyond the pleadings with affidavits, depositions, interrogatories, or other evidence to show that a genuine issue of material fact exists."  *Kocinec v. Public Storage, Inc.*, 489 F. Supp. 2d 555, 558 (E.D. Va. 2007) (citing *Celotex*, 477 U.S. at 324).  She has failed to do so.

---

[8] In her sur-reply, Ms. Arnold recounts specific facts of Gatling's harassing behavior that mirror some allegations in her complaint.  Sur-reply 6 ("Gatling targeted I, the Plaintiff with unwanted touching, including forcefully touching and grabbing my face, attempting to touch private areas and dangerously other misconduct").  Ms. Arnold's sur-reply, however, is not verified and thus cannot be considered an opposing affidavit for purposes of summary judgment.  *See United States v. White*, 366 F.3d 291, 300 (4th Cir. 2004) ("unsworn argument does not constitute evidence" for purposes of summary judgment); *see, e.g.*, *Walker v. Tyler Cnty. Comm'n*, 11 F. App'x 270, 274 (4th Cir. 2001) ("We thus affirm the district court's grant of summary judgment because the [plaintiffs'] opposition to the . . . defendants' motion rests on what we must regard as mere pleading allegations.").

Ms. Arnold attached to her opposition excerpts from text messages she exchanged with Harris and Andrews, but they do not mention Gatling or discuss sexual harassment.[9] ECF No. 310-1, at 22, 42–43, 49, 53–55, 57–59, 81–84. And, even if the Court considered Ms. Arnold's unsworn and inadmissible statement of facts (which it does not), she would fail to satisfy her burden. In her statement of facts, Ms. Arnold says the following about Gatling:

> [w]itness Christopher Binetti, a co-worker and observer, submitted a notarized statement attesting to Linwood Gatling's *physical and verbal sexual harassment*. Chrisopher Binetti is alive and available to testify. I also reported multiple incidents of Linwood Gatling appearing in my workspace even after complaints to management in person. Defendants never conducted an investigation or imposed discipline on Linwood Gatling, despite zero-tolerance policy claims and yard violations (automatic discharge).

ECF No. 308, at 2. The single reference to "Gatling's physical and verbal sexual harassment" is insufficient to create a genuine issue of material fact such that a reasonable jury could find that Gatling engaged in unwelcome conduct toward Ms. Arnold. The Court need not, and cannot, accept such a conclusory statement—"physical and verbal sexual harassment"—considering that Ms. Arnold offers *no other evidence* as to what actions form the basis thereof.[10] *See Barwick v.*

---

[9] Ms. Arnold also attaches to her opposition one page of an undated text message exchange between Ms. Arnold and Gatling. ECF No. 310-1, at 70. Although the Court excluded this message as a sanction on May 30, 2025, ECF No. 296, at 9–10, the one-page message discusses the animosity between Regina Arline and Ms. Arnold and has nothing to do with whether Gatling engaged in unwelcome conduct toward Ms. Arnold, ECF No. 310-1, at 70. Ms. Arnold has also attached her unsigned answers to interrogatories. ECF No. 310-1, at 95–100. As Ms. Arnold did not sign below the oath declaring under penalty of perjury that the answers are true and correct, the answers are not admissible evidence. Moreover, the answers contain no facts in support of her claim of sexual harassment. *Id.*

[10] Although not raised by either party, the Court notes that Ms. Arnold similarly testified in broad generalities on this topic at her deposition—she summarily referenced Gatling's "sexual harassment," but never offered any factual basis for this assertion. Dep. 207:6–15 ("I mentioned *the sexual harassment*. I mentioned, you know, that Regina Arline was friends with this particular person . . . Linwood Gatling" (emphasis added)); Dep. 247:11–15 ("I started bringing up the names of, you know, Regina Arline, what transpired, what her role was, also Kevin Cressman, also Linwood Gatling, and then I mentioned *sexual harassment* like as far as proof." (emphasis added));

*Celotex*, 736 F.2d 946, 959–60 (4th Cir. 1984) (determining that a conclusory affidavit that "[did]

not give specific facts, but only generalities" did not create a genuine issue of material fact under

Rule 56); *Melo v. Zumper, Inc.*, 439 F. Supp. 3d 683, 694 (E.D. Va. 2020) (same).

Ms. Arnold attaches to her opposition the following undated piece of paper with a typed

paragraph, below which appears to be Christopher Binetti's signature:



Dep. 261:1–3 ("I was like *the sexual harassment* was with Linwood Gatling and Kevin Cressman" (emphasis added)); Dep. 291:2–5 ("I told her about the names, which was Linwood Gatling, Kevin Cressman, why that I felt like *I was being retaliated against, hostile work environment*" (emphasis added)). Ms. Arnold also mentioned Gatling or sexual harassment when testifying about Arline bullying her. Dep. 194:20–24 ("[Arline] would sit with Linwood Gatling and they would have inappropriate conversations about me or—race wise or sexual orientation or other conversations, and, you know, I would just express like, hey, can we get back to work"); Dep. 229:17–21 ("I felt like I was being retaliated against for the situation of mentioning the sexual harassment, . . . the harassing and bullying behaviors from Regina Arline"); Dep. 250:18–251:1 ("he asked me about the connection of Linwood Gatling and Regina Arline, and I said, well, they're friends, and . . . I'm not fully sure of what's going on and why I was being bullied or targeted . . . she referenced certain things that Linwood Gatling might have said to her").

ECF No. 310-1, at 68 ("Binetti statement"); ECF No. 308, at 2 (citing the Binetti statement). The statement appears to contain a notary stamp, a notary seal, and potentially the notary signature. ECF No. 310-1, at 68.

The Court agrees with HII that the Binetti statement, however, is not admissible for summary judgment purposes. ECF No. 311, at 3. Assuming without deciding that the signature on the bottom left of the document is Christopher Binetti's, the statement is neither sworn to under penalty of perjury nor is there any indication that the notary administered an oath to Binetti. *Latney*, 2017 WL 7794573, at *2 ("[M]erely notarizing [a] signature does not transform a document into [an] affidavit that may be used for summary judgment purposes." (quoting *McCoy v. Robinson*, No. 3:08cv555, 2010 WL 3735128, at *2 (E.D. Va. Sept. 22, 2010)); *see also Vales*, 2012 WL 115425, at *2 ("The oath, and the penalty of perjury which gives the oath its true power, gives the Court strong reason to believe that the materials supporting the motion or the opposition are authentic."); 28 U.S.C. § 1746 (unsworn declarations under penalty of perjury); Va. Code Ann. § 47.1-16 (2024) (required elements for notarizations); *Randall v. Clarke*, No. 3:14cv562, 2015 WL 4705506, at *12 n.13 (E.D. Va. Aug. 6, 2015) ("As of 2009, every notarial act must contain: 1) a notarial statement; 2) the date of the notarial act; 3) the place of the notarial act; 4) the expiration of the notary's commission; 5) the notary's signature; 6) the notary's registration number; 7) a photographically reproducible notary seal/stamp"). As a result, the statement is not admissible for summary judgment purposes, and the Court will not consider it.[11]

---

[11] Even if the Binetti statement were properly sworn to, the Court rejects Ms. Arnold's argument in her sur-reply that it is not hearsay because it is a party admission made by an employee or agent within the scope of employment under Federal Rule of Evidence 801(d)(2)(D). ECF No. 316, at 4. That rule provides that a statement offered against an opposing party that "was made by the party's agent or employee on a matter within the scope of that relationship and *while it existed*" is not hearsay. Fed. R. Evid. 801(d)(2)(D) (emphasis added). Binetti last worked for HII on March 19, 2020. Reply 9 (citing ECF No. 311-2); *see also* Dep. 294:5–9. Although the Binetti statement

* * *

Beyond mere allegations, Ms. Arnold has offered *no evidence* that Gatling engaged in *any* unwelcome conduct, an essential element of count one—her Title VII hostile work environment claim. Because there is no evidence of unwelcome conduct, the Court does not address HII's argument that any alleged conduct was not severe or pervasive. Ms. Arnold has failed to establish a *prima facie* case of Title VII hostile work environment premised on Gatling allegedly sexually harassing her; therefore, HII is entitled to summary judgment on this point. *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) ("When the nonmoving party fails to establish the existence of an element essential to that party's case, 'there can be no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" (quoting *Celotex*, 477 U.S. at 323)).

### 3. Kevin Cressman

Ms. Arnold also alleges in count one a hostile work environment premised upon Kevin Cressman's sexual harassment of her. Compl. 10–14. HII argues that it is entitled to summary

---

is undated, the parties agree that Binetti wrote the statement after Ms. Arnold left HII's employment in September 2021. Reply 10 (citing Dep. 298:12–299:7). Therefore, the Binetti statement cannot be a party admission under Rule 801(d)(2)(D) because Binetti wrote it when he no longer worked for HII and when any such relationship ceased to exist, contrary to the requirements of the rule. Nevertheless, for a statement to constitute a party admission under Rule 801(d)(2)(D), "the proponent for admission must produce independent evidence showing that the scope of the declarant's authority included the matters discussed in the alleged conversation." *Parker v. Danzig*, 181 F. Supp. 2d 584, 592 (E.D. Va. 2001) (citing *Precision Piping & Instr., Inc. v. E.I. du Pont de Nemours & Co.*, 951 F.2d 613, 619–20 (4th Cir. 1991)); *see also United States v. Brothers Const. Co. of Ohio*, 219 F.3d 300, 311 (4th Cir. 2000) ("[t]he corporation's agent need not have authority to make the statement at issue, but rather the subject of the statement must relate to the employee's area of authority"); *McCallum v. CSX Transp., Inc.*, 149 F.R.D. 104, 111 (M.D.N.C. 1993) ("Employees do not come under Fed. R. Evid. 801(d)(2)(D) unless their job function has something to do with the issue at hand."). Ms. Arnold has not submitted evidence to establish that the subject matter of the statement, Gatling's conduct toward Ms. Arnold, concerns a matter within the scope of Christopher Binetti's employment with HII.

judgment on this issue because Ms. Arnold did not timely file her EEOC charge for Title VII hostile work environment based on sexual harassment. The Court agrees.[12]

"[A]n employee challenging an employment practice of an employer in Virginia has 300 days from the last date of alleged discrimination to file a charge with the EEOC." *Edwards*, 760 F. Supp. 2d at 619 (citing *Edelman*, 300 F.3d at 404). Under the continuing violation theory, an employee can rely on harassing conduct (that is, alleged discrimination) that occurred outside the limitations period to establish a hostile work environment claim, and that claim will be timely so long as "at least one act continuing the violation occurred within the statutory period." *Guessous*, 828 F.3d at 222.

Although the Court found that Ms. Arnold plausibly alleged "several acts" that satisfied the continuing violation theory when it—accepting all of her factual allegations as true—denied HII's motion to dismiss count one, pleading plausibly is different from demonstrating a *prima facie* case as required at this stage. ECF No. 73, at 18. Thus, the Court noted that "'evidence developed during discovery may tend to strengthen or undermine' a plaintiff's entitlement to the continuing violation theory." *Id.* at 18 n.6 (citing *Edwards*, 760 F. Supp. 2d at 625). The Court also clarified that HII was "free to raise its timeliness argument in a future dispositive motion, with an expanded record." *Id.* Discovery is now complete, and the expanded record (or lack thereof) is before the Court. Ms. Arnold did not timely file her EEOC charge alleging Title VII sexual

---

[12] HII also argues that it is entitled to summary judgment because: (1) there is no admissible evidence in the record to prove Ms. Arnold's hostile work environment claim against Cressman; (2) Ms. Arnold welcomed Cressman's messages; (3) the messages were exchanged while off-duty and outside the workplace; (4) Ms. Arnold waited eight months to report Cressman; and (5) the messages do not rise to the level of severe or pervasive conduct. HII Mem. 15–20. The Court, however, need not address these arguments because Ms. Arnold did not timely file her EEOC charge.

harassment based on a hostile work environment theory—the allegations of which form the basis of count one.

Ms. Arnold filed her EEOC charge on December 12, 2021. ECF No. 54-1. Thus, "at least one act continuing the violation" must have occurred after February 15, 2021, 300 days before. *Edwards*, 760 F. Supp. 2d at 619 (citation omitted). The basis of Ms. Arnold's hostile work environment claim is that Gatling and Cressman sexually harassed her. Compl. 5–14. The Court, however, has concluded that Ms. Arnold has submitted *no* evidence that Gatling engaged in unwelcome conduct toward Ms. Arnold and thus HII is entitled to summary judgment as to Gatling because Ms. Arnold failed to establish an element essential to that claim. The only remaining allegations that Ms. Arnold was subject to a hostile work environment at HII are those relating to Kevin Cressman.

The evidence in the record that potentially supports Ms. Arnold's allegations against Cressman is a series of messages he sent to her beginning in June 2020. ECF No. 300-10. HII has submitted a copy of the messages with its motion for summary judgment. *Id.* Ms. Arnold's deposition testimony confirms that her allegations of sexual harassment against Cressman are based on the message exchange. Dep. 232:11–17 ("I told him about [Cressman's] sexual harassment . . . I told him about just messages"); Dep. 233:7–10 ("Q. . . . [W]hat exactly did you tell Foreman Andrews about Kevin Cressman. A. Well, yeah, I told him about the sexual harassment. I told him about the messages."). The evidence in the record shows that messages between Ms. Arnold and Cressman began on June 28, 2020, and ended on September 19, 2020— 449 days before she filed her EEOC charge on December 12, 2021. ECF No. 300-10; ECF No. 54-1. Thus, if the record does not contain evidence that Cressman engaged in unwelcome conduct toward Ms. Arnold after February 15, 2021—300 days before Ms. Arnold filed her EEOC

charge—then Ms. Arnold's EEOC charge is untimely under the continuing violation theory. The Court finds that there is no such evidence.

In Ms. Arnold's unsworn statement of facts, she states that she "continued working with . . . Cressman from April 2021 through September 2021" and "Cressman's disturbing behavior— including suicidal threats, stalking, leering, and verbal abuse—worsened after [her] complaints." ECF No. 308, at 2. Ms. Arnold cites no affidavit, declaration, or other documentary evidence appropriate for summary judgment in support of that statement. *Id.* The only statement sworn to under oath potentially supportive of that statement is from Ms. Arnold's deposition. When asked what she said in the April 12, 2021 meeting with Andrews and her union representative, Ms. Arnold testified in part:

> So Mr. Townes was looking through my phone. He looked through text messages from Linwood Gatling. He looked at text messages from Kevin Cressman[.]
> . . .
> [Andrews] went through reading messages and asking questions . . . something about like why did I block – because he saw that Kevin Cressman was blocked. *I was like he was just going to continue to message me if I didn't, so – and then now that I'm on his team he is going to continue to do certain things that I feel like I'm not comfortable with because he had a – you know, a drinking problem, and he just didn't know how to control himself in my opinion at work, so I told him I was concerned with that.*
>
> I mentioned his drinking problem, which he kind of admitted himself that he has one. So – and it just – it was a bunch of conversations mostly on the names and how I felt about it and what was going on, and then they said that they would try to look into an alternative situation for me of that matter.

Dep. 250:8–252:19 (emphasis added).

Even the most generous reading of this testimony is insufficient to raise any genuine dispute of fact as to whether, between April 2021 and September 2021, "Cressman's disturbing behavior—including suicidal threats, stalking, leering, and verbal abuse—worsened after [Ms. Arnold] complaints." ECF No. 308, at 2. Ms. Arnold's testimony is that, on the first day she was

transferred to Andrews' crew with Cressman in April 2021, she was concerned that Cressman's conduct might be renewed. This, however, is different from Ms. Arnold testifying that Cressman did renew his unwelcome conduct after she started working with him and complained about his conduct. In other words, Ms. Arnold has offered no evidence to support her unsworn assertion in her statement of facts, and the Court does not consider it.

The only evidence in the record that reflects any potentially unwelcome conduct by Cressman to Ms. Arnold is the Facebook messages. ECF No. 300-10. The record shows that the last day Cressman sent Ms. Arnold a message was on September 19, 2020—449 days before she filed her EEOC charge on December 12, 2021. Because there is not "at least one act continuing the violation" that occurred in the 300 days prior, her EEOC charge was not timely. HII is therefore entitled to summary judgment on this basis.

\* \* \*

Count one alleges that Ms. Arnold endured a hostile work environment at HII because Gatling and Cressman sexually harassed her. Ms. Arnold has offered no evidence that Gatling engaged in any unwelcome conduct toward her, an essential element of her claim. Thus, "'there can be no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of [her] case necessarily renders all other facts immaterial." *Coleman*, 369 F. App'x at 461 (quoting *Celotex*, 477 U.S. at 323)). Similarly, because the last message Cressman sent to Ms. Arnold was on September 19, 2020, Ms. Arnold did not timely file her EEOC charge because there is no evidence that "at least one act continuing the violation occurred" in the 300 days before she filed the charge on December 12, 2021. *Guessous*, 828 F.3d at 222.

Therefore, HII has shown that there is no genuine dispute as to any material fact and, as a matter of law, there is no evidence "such that a reasonable jury could return a verdict" for Ms.

Arnold on count one. *Anderson*, 477 U.S. at 248. Therefore, HII is entitled to summary judgment on count one.

**C.    Count VIII:  Constructive discharge claim**

In count eight, Ms. Arnold asserts she was constructively discharged by HII. Compl. 30. HII asserts Ms. Arnold has failed to show her workplace was intolerable at the time she resigned. HII Mem. 22–23. "To establish constructive discharge, an employee must meet a high standard." *Ofoche v. Apogee Med. Grp.*, 815 F. App'x 690, 692 (4th Cir. 2020). Along with resigning from employment, a plaintiff must show that her "working conditions became so intolerable that a reasonable person in [her] position would have felt compelled to resign." *Perkins*, 936 F.3d at 211–12 (citation omitted). HII agrees that Ms. Arnold resigned. HII SOF ¶ 4. The remaining issue is whether Ms. Arnold has established facts satisfying intolerability.

Intolerability is examined "from the objective perspective of a reasonable person." *Heiko v. Colombo Sav. Bank, F.S.B.*, 434 F.3d 249, 262 (4th Cir. 2006). "[M]ere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Id.* (internal quotation mark and citation omitted). A plaintiff "must show something more than the showing required for a hostile work environment claim." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 193 (4th Cir. 2019) (citing *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004)). "Unless conditions are beyond ordinary discrimination, a complaining employee is expected to remain on the job while seeking redress." *Id.* (internal quotation marks and citations omitted).

In assessing if an employee was constructively discharged, a court should consider the frequency of the harassing conduct as "[t]he more continuous the conduct, the more likely it will establish the required intolerability." *Id.* Moreover, "to constitute constructive discharge,

26

harassment must be intolerable at the time of the employee's resignation." *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1465 (9th Cir. 1994); *see also Jones v. Greenville Hosp.*, No. 97-2306, 1998 WL 823481, at *3 (4th Cir. 1998) (finding the timing of plaintiff's resignation, two months after the alleged harasser quit, "defeats [her] claim for constructive discharge").

Ms. Arnold has not established a genuine dispute of material fact with respect to whether a reasonable person in her position would have felt compelled to resign due to intolerable working conditions. The evidence in the record establishes that Gatling and Cressman were no longer working with Ms. Arnold when she submitted her letter of resignation on August 27, 2021, and worked her last day on September 8, 2021. Even had Ms. Arnold established unwanted conduct by Gatling, HII terminated Gatling for poor attendance, and his last day worked was June 30, 2021. HII SOF ¶ 7.

On August 20, 2021, HII transferred Cressman from Andrews' third shift crew to which Ms. Arnold was assigned, to work first shift at a location at the opposite end of NNS. *Id.* ¶ 6. Accordingly, Cressman was not working the same shift or in the same location as Ms. Arnold at the time she submitted her letter of resignation or worked her last days. The only evidence of harassment from Cressman—the exchange of messages—ended on September 19, 2020, almost one year before Ms. Arnold alleges she was constructively discharged. To the extent Ms. Arnold is relying on her sexual harassment allegations to establish constructive discharge, the summary judgment record shows that no reasonable person in her situation would have felt forced to leave.

Ms. Arnold also asserts that HII's interference with her FMLA rights contributed to her constructive discharge. Compl. 30. As will be discussed in section IV.E.1. below, Ms. Arnold has not established a right to FMLA benefits. Further, her requests for FMLA benefits occurred in April and July 2021. Ms. Arnold has failed to establish that HII's refusal to grant FMLA leave at

that time, leave to which she was not entitled, created working conditions that were "so intolerable that a reasonable person in [her] position would have felt compelled to resign" in September 2021. *See Perkins*, 936 F.3d at 211–12.   Ms. Arnold has failed to establish facts that satisfy the intolerability requirement, and HII is entitled to summary judgment on Ms. Arnold's constructive discharge claim in count eight.

**D.    Count III: Title VII retaliation**

Ms. Arnold asserts in count three that HII retaliated against her for reporting sexual harassment.  Compl. 24–27.  Title VII prohibits an employer from "discriminat[ing] against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice by" Title VII.   42 U.S.C. § 2000e-3.   A plaintiff may prove a Title VII retaliation claim either through direct evidence of retaliation or the *McDonnell Douglas* burden-shifting framework.   *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 122 (4th Cir. 2021); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Ms. Arnold has not alleged any direct evidence of retaliation and relies on the *McDonnell Douglas* framework to prove her claim.  To prevail under that framework, a plaintiff must first establish a *prima facie* case by showing: "(1) that [s]he engaged in protected activity, (2) that the employer took a materially adverse action against [her,] and (3) there is a causal connection between the protected activity and the adverse action." *Perkins*, 936 F.3d at 213.  After a plaintiff establishes a *prima facie* case, the burden shifts to the employer to show that it took the adverse action for a legitimate non-retaliatory reason.  *Roberts*, 998 F.3d at 122.  If the employer makes this showing, then the burden shifts back to the plaintiff to show the employer's purported non-retaliatory reasons were pretext for discrimination.  *Id.*

28

HII seeks summary judgment on count three, asserting Ms. Arnold cannot show a causal connection between her reports of sexual harassment and any adverse action that it took. HII Mem. 23–24; Reply 11–12. To determine whether a causal connection exists, the Court must first identify the alleged adverse action and the protected activity. The adverse action Ms. Arnold relies on in count three is her constructive discharge. Compl. 26 ("Defendants constructively discharged me on September 8, 2021, for my protected activities"). Ms. Arnold has not established that she was constructively discharged, and this cannot serve as an adverse action for purposes of her retaliation claim. *See Cooper v. Smithfield Packing Co.*, 724 F. App'x 197, 201 (4th Cir. 2015) (dismissing retaliation claim where plaintiff failed to prove her resignation was due to constructive discharge).

In another part of her complaint referencing retaliation, Ms. Arnold alleges she was "disciplined[13] and moved to a less favorable location on the boat with a new [f]oreman." Compl. 22. The Court will address Ms. Arnold's retaliation claim premised on this transfer. To determine whether her engagement in protected activity caused her transfer, the Court must first identify Ms. Arnold's protected activity. Relevant here, "[p]rotected activity under Title VII includes complaints of discrimination based upon . . . sex[.]" *Roberts*, 998 F.3d at 122 (internal quotation marks and citation omitted). In March 2021, Ms. Arnold complained to Harris about issues she was having with Regina Arline, specifically that Arline was bullying her, gossiping, spreading rumors, and not working. HII SOF ¶ 9; ECF No. 310-1, at 44. Ms. Arnold then met with Harris and Bridges to discuss a verbal altercation that she had with Arline. HII SOF ¶ 9. Ms. Arnold mentioned Gatling's name during this meeting, but only because he was friends with

---

[13] Read in context, the discipline Ms. Arnold references in the complaint is the transfer to Andrews' crew. ECF No. 52, at 30 ("Defendants . . . did give me a disciplinary action by moving me for reporting the misconduct.").

29

Arline. *Id.* ¶ 9. The conversations Ms. Arnold had with Harris and Bridges about Arline are not protected activities as Ms. Arnold was not reporting discrimination (that is, a hostile work environment based on sexual harassment).

Sometime in April 2021, Ms. Arnold called Bridges to report that there was "more to the story" and she had "proof of sexual harassment." *Id.* ¶ 13. During this call, Ms. Arnold did not go "in-depth" about her allegations. *Id.* ¶ 13. This phone call is the first time Ms. Arnold potentially engaged in protected activity.[14] There is, however, no evidence in the record to establish when in April this phone conversation occurred.[15]

General foreman Madison has explained that he decided to reallocate personnel on the third shift to ensure each crew had a balanced mix of qualifications. Madison Decl. ¶ 3. Madison began this process in February 2021 and HII provided the spreadsheet Madison used to complete this task. *Id.*; ECF No. 300-2, at 2–6. Because of this reallocation, over a dozen people, including Ms. Arnold, were transferred to different crews. Madison Decl. ¶ 3. Madison transferred Ms. Arnold to foreman Andrews' crew on April 12, 2021. *Id.*

"To demonstrate the requisite causal link between the protected activity and the adverse employment action, a plaintiff must generally show at the very least that the [adverse action] occurred after the decision-making authority became aware of the employee's grievance." *Francisco v. Verizon S., Inc.*, 442 F. App'x 752, 754 (4th Cir. 2011) (internal quotation marks and

---

[14] Ms. Arnold's other reports of sexual harassment post-date the transfer on April 12, 2021. HII SOF ¶¶ 10–12.

[15] When asked when she called Bridges at her deposition, Ms. Arnold responded: "Gosh, I sent the call log. It should have been in April of 2021 I want to safely say if I can recall that, yes. I think it was that[.]" Dep. 289:4–7.

citations omitted). Further, "the employer must have taken the adverse employment action *because* the plaintiff engaged in a protected activity."[16] *Roberts*, 998 F.3d at 124 (citation omitted).

There is no evidence in the record that Ms. Arnold's phone conversation with Bridges took place before Madison transferred Ms. Arnold on April 12, 2021. Even if evidence existed proving the conversation took place before April 12, 2021, nothing in the record suggests that Madison was aware of the phone conversation between Ms. Arnold and Bridges.[17] Nor is there evidence that Bridges had any input into Madison's decision to transfer Ms. Arnold. Consequently, Ms. Arnold has not presented sufficient evidence to create an issue of material fact as to whether she complained of harassment before Madison transferred her or that Madison knew she complained of harassment at the time he decided to transfer her. Because Ms. Arnold cannot establish a causal connection between her reporting sexual harassment and Madison's decision to transfer her to Andrews' crew—"an element essential to [her] case, and on which [she] will bear the burden of proof at trial"—HII is entitled to summary judgment on count three, Ms. Arnold's Title VII retaliation claim. *Celotex*, 477 U.S. at 322.

## E.    Counts VI and VII:  FMLA interference and retaliation

In counts six and seven, Ms. Arnold alleges HII interfered with her right to take FMLA leave and retaliated against her for attempting to take FMLA leave. Compl. 28–29. Under the FMLA, an eligible employee is entitled to 12 workweeks of leave during any 12-month period to

---

[16] Ms. Arnold cannot rely on temporal proximity, that the adverse action occurred shortly after the protected activity, to demonstrate causation because there is no evidence that the conversation occurred before her transfer on April 12, 2021. *See Roberts*, 998 F.3d at 123.

[17] Ms. Arnold testified that when she spoke to Madison on April 14, 2021, to tell him she was "upset" about the transfer, she also reported to Madison that she was being sexually harassed and his response was, "what? You know, he freaks out. He was like, what—what are you talking about, what sexual harassment?" Dep. 258:21–23.

care for, among others, a parent with a serious health condition. 29 U.S.C. § 2612(a)(1)(C). The FMLA defines a serious health condition as "an illness, injury, impairment, or physical or mental condition that involves—(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." *Id.* § 2611(11).

### 1.    Ms. Arnold cannot show HII interfered with her FMLA leave.

The FMLA provides "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right" under the FMLA. 29 U.S.C. § 2615(a)(1). To establish an "interference" claim under the FMLA, an employee must demonstrate: (1) she is entitled to an FMLA benefit; (2) her employer interfered with the provision of that benefit; and (3) the interference caused her harm. *Boone v. Bd. of Governors of Univ. of N.C.*, 858 F. App'x 622, 624 (4th Cir. 2021) (citing *Adams v. Anne Arundel Cnty. Pub. Schs.*, 789 F.3d 422, 427 (4th Cir. 2015)).

HII asserts that Ms. Arnold cannot demonstrate entitlement to an FMLA benefit—the first prong of an interference claim—because she has offered no evidence that her mother was treated for a serious health condition in 2021 and did not provide HII with a certification issued by a healthcare provider with her requests for FMLA leave. HII Mem. 25–27; ECF No. 311, at 13–14. An employee requesting FMLA leave must "provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request." *Shoemaker v. Alcon Lab'ys, Inc.*, 741 F. App'x 929, 932 (4th Cir. 2018) (quoting 29 C.F.R. § 825.303(b)); *Huan Zhou v. Lowe's Home Centers, LLC*, No. 1:20cv370, 2021 WL 2666595, at *12 (E.D. Va. June 29, 2021). The FMLA and its implementing regulations permit an employer to "require that an employee's leave to care for the employee's covered family member with a serious health condition . . . be supported by a certification issued by the health care provider of . . . the

32

employee's family member." 29 C.F.R. § 825.305(a); 29 U.S.C. § 2613(a); *see Rhoads v. FDIC,*

257 F.3d 373, 383 (4th Cir. 2001) ("An employer has discretion to require that an employee's

leave request 'be supported by a certification issued by the health care provider[.]'" (quoting 29

U.S.C. § 2613(a)).

> At the time the employer requests certification, the employer must also advise an
> employee of the anticipated consequences of an employee's failure to provide
> adequate certification. If the employee fails to provide . . . any certification, the
> employer may deny the taking of FMLA leave . . . It is the employee's responsibility
> either to furnish a complete and sufficient certification or to furnish the health care
> provider providing the certification with any necessary authorization from the
> employee or the employee's family member in order for the health care provider to
> release a complete and sufficient certification to the employer to support the
> employee's FMLA request.

29 C.F.R. § 825.305.

Ms. Arnold submitted three documents requesting FMLA leave, each comprised of a 1-

page request form and a 5-page certification form. ECF Nos. 300-7–300-9. The request form

states, "[y]our request must be accompanied by one of the following" and lists five potential

attachments, including the "WH-380F Certification of Health Care Provider for Family Member's

Serious Health Condition."[18] *Id.* According to HII's Labor Relations, "[i]n 2021, only Labor

Relations could determine whether an employee qualified for leave under FMLA" and "Labor

Relations would only approve a FMLA leave request for a serious health condition of the employee

or the employee's family member if the employee submitted a complete [WH380] Certification

Form signed by a health care provider." Bridges Decl. ¶¶ 15–16, ECF No. 300-1. Ms. Arnold

---

[18] The five attachment options include two that apply if the employee is seeking military family
leave, one that applies to adoption or foster care, one that applies to an employee with a serious
health condition, and the provision that applies if an employee's family member has a serious
health condition. ECF No. 300-7, at 1.

acknowledges that she was told of this requirement. Dep. 75:24–76:8, 91:14–17, 96:1–2, 100:13–14; ECF No. 300-7, at 1; ECF No. 300-8, at 1; ECF No. 300-9, at 1.

With her opposition, Ms. Arnold provided multiple unauthenticated documents addressing her mother's treatment in 2017. ECF No. 310-1, at 12, 14, 16, 18, 71, 73, 75, 77, 79. She likewise provided an unauthenticated, one-page, after visit summary for her mother's hospital stay in February 2020 and an unauthenticated, one-page, discharge summary note dated March 16, 2020. *Id.* at 19–20.

She has not submitted, however, *any* evidence to suggest that a healthcare provider was caring for her mother in 2021 when she sought to take FMLA leave. At her deposition, Ms. Arnold was unable to identify any healthcare provider who treated her mother in 2021. Dep. 29:15–31:15, 36:5–11, 38:11–39:5, 45:19–47:10, 57:16–24. Absent any evidence in the record that, in 2021, her mother was either in inpatient care in a hospital, hospice, or residential medical care facility; or under continuing treatment by a healthcare provider, there is no evidence that Ms. Arnold could have obtained a certification form signed by healthcare provider that would have certified that Ms. Arnold's mother had a serious health condition in 2021 as required by the FMLA.[19] *Brown v.*

---

[19] HII requested production of Ms. Arnold's mother's medical records in discovery, ECF No. 235-3, at 5 (requesting "[a]ll documents that a Health Care Provider prepared (including but not limited to diagnoses, evaluations, medical records, progress notes, etc.), relating in any way to your mother's medical consultation, treatment, counseling or exam for any Health Condition which you claim was a Serious Health Condition in 2021."), and the Court granted HII's motion to compel production of those documents. ECF No. 261, at 2. The only medical records Ms. Arnold produced in response to the order were records from 2017, 2018, and 2020. *See* ECF No. 280-37, at 2–5 (list of documents produced). At the evidentiary hearing on HII's motion for sanctions, Ms. Arnold testified that she also produced to HII a list of her mother's medications from 2020, ECF No. 290-5, and an undated letter from a physician whose name and medical group had been redacted—stating that Ms. Arnold has been the caregiver for her mother for the last three years, her mother's "condition improves greatly when she is being cared for by her daughter," and Ms. Arnold should be "excused from responsibilities at her workplace" to continue caring for her mother, ECF No. 290-1. ECF No. 296, at 8. The Court found Ms. Arnold's testimony was not

*Greenspring Vill., Inc.*, No. 1:08cv1043, 2009 WL 10677267, at *2 (E.D. Va. Aug. 21, 2009),

*aff'd*, 450 F. App'x 234 (4th Cir. 2010) (affirming grant of summary judgment for the employer

where employee failed to provide evidence that a healthcare provider would have certified that she

had a serious health condition). Ms. Arnold has not offered any evidence that her mother had a

serious health condition in 2021, and, therefore, Ms. Arnold failed to produce evidence sufficient

for a factfinder to conclude that she was entitled to an FMLA benefit, the first prong of her *prima*

*facie* case.[20] *See Rhoads*, 257 F.3d at 384 ("the district court correctly required [plaintiff] to prove

that she was afflicted with an FMLA-qualifying condition, because otherwise she did not have any

right under the Act with which her employer could have interfered").[21] Ms. Arnold has failed to

---

credible and prohibited Ms. Arnold from using these documents not produced during discovery in support of her claims. *Id.*

[20] Ms. Arnold attaches to her opposition a letter addressed to "Your Honor" signed by her co-worker, Robert Bethel. ECF No. 310-1, at 3. While there is a stamp indicating a notary's name and registration number, the notary did not sign the statement, the statement is not dated, and nothing suggests that the notary administered an oath to Bethel. *Id.* As a result, the statement is not admissible for summary judgment purposes. *Latney*, 2017 WL 7794573, at *2. Also, Ms. Arnold has not submitted evidence to establish that the subject matter of Bethel's statement, her requesting FMLA leave, concerns a matter within the scope of Bethel's employment with HII and the statement falls outside the hearsay exclusion in Rule 801(d)(2)(D). Even if the Court were to consider Bethel's statement, it does not create a genuine dispute of material fact. Bethel states that Ms. Arnold told him she planned to request FMLA leave to care for her mother, that she was told she needed a doctor's note to request FMLA leave, and that her request for a leave of absence to go to Philadelphia to get a doctor's note was denied. ECF No. 310-1, at 3.

[21] Ms. Arnold admits that she did not submit a certification form signed by a healthcare provider in support of any of her requests for FMLA leave. Dep. 86:16–87:6, 92:18–93:9; 99:11–20. Ms. Arnold's failure to provide HII with a certification form signed by a healthcare provider when she requested FMLA leave is also fatal to her FMLA interference claim. *See Ahmed v. Salvation Army*, No. 12-707, 2012 WL 6761596, at *8 (D. Md. 2012) (granting employer summary judgment on FMLA claim where plaintiff failed to submit a completed certification form), *aff'd*, 549 F. App'x 196 (4th Cir. 2013); *Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 771 (7th Cir. 2008) ("[T]he failure to turn in the forms forecloses Ridings's ability to persevere on an FMLA interference claim because she did not fulfill her obligations in order to be protected[.]"); *Frazier v. Honda of Am. Mfg., Inc.*, 431 F.3d 563, 567 (6th Cir. 2005) (affirming summary judgment because plaintiff failed to establish he was entitled to FMLA leave because he did not timely submit a certification).

establish a genuine dispute of material fact with respect to her entitlement to FMLA leave and, therefore, HII is entitled to summary judgment on count six alleging interference with FMLA leave.

**2.    Ms. Arnold's FMLA retaliation claim fails because she has not established that HII's proffered explanation is pretextual.**

The FMLA provides that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). "Retaliation claims brought under the FMLA are analogous to those brought under Title VII." *Twine v. AT&T, Inc.*, 755 F. Supp. 3d 959, 983 (E.D. Va. 2024) (citing *Adams*, 789 F.3d at 429). Thus, "[t]o establish a *prima facie* retaliation claim under the FMLA, the plaintiff must demonstrate that [s]he engaged in protected activity, that the employer took adverse action against [her], and that the adverse action was causally connected to the plaintiff's protected activity." *Sabouri-Yazdi v. Red Coats, Inc.*, 751 F. App'x 389, 391 (4th Cir. 2018) (internal quotation marks and citation omitted)). Like a Title VII retaliation claim, after a plaintiff establishes a *prima facie* case, the burden shifts to the employer to show that it took the adverse action for a legitimate non-retaliatory reason. *Roberts*, 998 F.3d at 122. If the employer makes this showing, then the burden shifts back to the plaintiff to show that the employer's purported non-retaliatory reasons were pretext for discrimination. *Id.*

HII asserts it is entitled to summary judgment on Ms. Arnold's FMLA retaliation claim because she has failed to show she engaged in a protected activity under the FMLA and HII has offered a nondiscriminatory explanation for the adverse action that Ms. Arnold has failed to show was pretext for retaliation. HII Mem. 27–28.

First, HII argues Ms. Arnold has not alleged facts to show she was entitled to leave "*a fortiori*, [s]he does not allege sufficient facts to establish that [she] was engaged in protected

activity under the FMLA." *Id.* at 27 (citing *Caldwell v. United Parcel Serv., Inc.*, No. 7:15cv358, 2015 WL 6159509, at *6 (W.D. Va. Oct. 20, 2015)). The Court rejects this argument. The plaintiff in *Caldwell* did not allege sufficient facts to show that he was eligible to take FMLA leave. *Caldwell*, 2015 WL 6159509, at *6. Because Caldwell was not an "eligible employee" entitled to protection under the FMLA, he could not have engaged in protected activity. *Id.*; *see also Osei v. Coastal Int'l Sec., Inc.*, 69 F. Supp. 3d 566, 569 (E.D. Va. 2014). HII has not asserted that Ms. Arnold was not an "eligible employee" under the FMLA.[22] Instead, HII argues that she has not presented sufficient facts showing entitlement to FMLA leave.

Second, HII argues Madison has offered a nondiscriminatory explanation for Ms. Arnold's transfer to Andrews' crew and she has failed to show his reason was pretext for retaliation. Madison has explained that he decided to reallocate personnel on the third shift to ensure each crew had a balanced mix of qualifications and that he began this process in February 2021. HII Mem. 24 n.20. Importantly, Madison's decision did not just affect Ms. Arnold, rather over a dozen people were transferred to different crews. Madison Decl. ¶ 3.

If Ms. Arnold "puts forth sufficient evidence to establish a *prima facie* case of retaliation" and HII "offers a non-discriminatory explanation" for the adverse action, Ms. Arnold "bears the burden of establishing that [HII's] proffered explanation is pretext for FMLA retaliation." *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 551 (4th Cir. 2006). Ms. Arnold has offered no evidence that Madison's decision to transfer her to Andrews' crew as part of his reallocation was pretext for retaliating against her for requesting FMLA leave. Ms. Arnold asserts that she overheard a conversation between Harris and Andrews at the beginning of April 2021

---

[22] The FMLA defines "eligible employee" as an individual employed by the employer for at least 12 months who worked at least 1,250 hours during the previous 12-month period. 29 U.S.C. § 2611(2)(A).

from which she believed she was not going to be one of the people Madison transferred. ECF No. 308, at 20; Dep. 228:20–229:6 ("Wesley Harris and Andrew Sidney, they were having a conversation, but they were just like . . . certain bad apples are being weeded out, and then they looked over and was like you're not one of them so you don't have anything to worry about. . . . And then . . . maybe a week later [Ms. Arnold] hear[d] something entirely different from that."). This overheard conversation is not sufficient evidence that Madison was not intending to transfer Ms. Arnold or that his real motivation in transferring her was because of her attempts to take FMLA leave.

Ms. Arnold has failed to meet her burden to establish a genuine dispute of material fact that HII's proffered explanation is pretext for any retaliatory action it took in response to her attempts to take FMLA leave. Accordingly, HII is entitled to summary judgment on count seven alleging FMLA retaliation.

## V.    RECOMMENDATION

For these reasons, the undersigned **RECOMMENDS** that HII's motion for summary judgment, ECF No. 299, be **GRANTED** on Ms. Arnold's Title VII sexual harassment/hostile work environment claim (count one), Title VII retaliation claim (count three), FMLA interference claim (count six), FMLA retaliation claim (count seven), and constructive discharge claim (count eight), and that judgment be entered for HII.

## VI.    REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.    Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report

is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.     A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are **ADVISED** that the **Court will not entertain motions for extension of time to file objections or responses to objections.** The parties are further **NOTIFIED** that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

The Clerk is **DIRECTED** to send a copy of this report and recommendation to Ms. Arnold and all counsel of record. In addition to the standard method of delivery, the Clerk is further **DIRECTED** to email a copy of this report and recommendation to Ms. Arnold.

_____
Robert J. Krask
United States Magistrate Judge

Norfolk, Virginia
July 29, 2025

39